IN THE SUPREME COURT OF NORTH CAROLINA

2021-NCSC-53

No. 291A20

Filed 23 April 2021

IN THE MATTER OF: N.B., N.M.B., M.R.

Appeal pursuant to N.C.G.S. § 7B-1001(a1)(1) from orders entered on 9 March 2020 by Judge Joseph Moody Buckner in District Court, Orange County. This matter was calendared for argument in the Supreme Court on 19 March 2021 but was determined on the record and briefs without oral argument pursuant to Rule 30(f) of the North Carolina Rules of Appellate Procedure.

*Stephenson & Fleming, LLP, by Angenette Stephenson, for petitioner-appellee Orange County Department of Social Services.*

*Olabisi A. Ofunniyin and Matthew W. Wolfe for appellee Guardian ad Litem.*

*Dorothy Hairston Mitchell for respondent-appellant mother.*

*J. Thomas Diepenbrock for respondent-appellant father.*

ERVIN, Justice.

Respondent-mother Stacey W. appeals from the trial court's orders terminating her parental rights in N.B., N.M.B., and M.R., while respondent-father Jerald B. appeals from the trial court's order terminating his parental rights in N.B.[1]

---

[1] N.B., N.M.B., and M.R., respectively, will be referred to throughout the remainder of this opinion as Natasha, Nylah, and Merise, which are pseudonyms used for ease of reading and to protect the juveniles' privacy.

After careful review of the record in light of the applicable law, we affirm the trial court's orders.

## I.     Factual Background

On 25 July 2017, a child protective services agency in Hagerstown, Maryland, received a referral expressing concern that Natasha and Nylah had been neglected by a woman with whom they had lived in Maryland during a time in which respondent-mother had been incarcerated. At the time of the making of this referral, Natasha, Nylah, and Merise were residing in Chapel Hill with the sister of a woman that respondent-mother described as her "foster mother" and that the children referred to as their "great-aunt" despite the absence of any biological relationship between this individual and either respondent-mother or the children. The children had begun living with this individual in January 2017, when this individual had traveled to Maryland and retrieved the children in light of respondent-mother's incarceration and the inability of the persons with whom the children had initially been left to provide adequate care for them.

Upon learning that the children had been living in Chapel Hill for the last six months, the Maryland child protective services agency contacted the Orange County Department of Social Services, which undertook responsibility for investigating the report. At the time that DSS became involved with the children, respondent-mother,

who had been released on parole, had been unable to establish consistent employment or housing while respondent-father was incarcerated.

¶ 4        In the course of the investigation, Natasha and Nylah reported that respondent-mother had frequently been incarcerated and that they had been subjected to inappropriate discipline by caretakers, had been exposed to illegal drugs, and had endured inappropriate touching. In light of these allegations of abuse, a child medical evaluation was conducted upon Natasha and Nylah on 14 September 2017. At the conclusion of the examination, the examiner expressed concern that both Natasha and Nylah had been physically and sexually abused.

¶ 5        On 3 November 2017, DSS filed juvenile petitions alleging that Natasha, Nylah, and Merise were abused, neglected, and dependent juveniles. In its petitions, DSS asserted that respondent-mother had a history of incarceration, during which the children had lived with multiple caretakers who subjected the children to excessive discipline, failed to provide the children with adequate food, and failed to provide the children with an adequate level of care. In addition, DSS alleged that the children had been physically and sexually abused while in respondent-mother's care and that respondent-mother had been released from incarceration and was threatening to remove the children from the home of their current caretaker. In order to prevent respondent-mother from taking the children into her care, DSS sought and obtained the entry of an order placing the children into nonsecure custody and

allowing them to continue living with their current caretaker. Eventually, the children's caretaker became unable to care for them, so that the children entered foster care.

¶ 6        After an adjudicatory hearing held on 15 February 2018, the trial court entered an order on 26 March 2018 finding that the children were neglected and dependent juveniles. The trial court ordered that the custody of the children remain with DSS, required respondent-mother to comply with a family services agreement, and authorized respondent-mother to engage in supervised visitation with the children. In view of the fact that respondent-father continued to be incarcerated, the trial court ordered him to provide DSS with a specific release date.

¶ 7        On 19 July 2018, the trial court held an initial permanency planning hearing. On 31 August 2018, the trial court entered a permanency planning order in which it found that, while DSS had made reasonable efforts to reunify the children with their parents, neither respondent-mother nor respondent-father had been actively attempting to successfully reunify with the children or making themselves available to DSS. As a result, the trial court adopted a primary permanent plan of adoption, with a secondary permanent plan of reunification, and authorized DSS to seek the termination of the parents' parental rights in the children.

¶ 8        On 21 October 2019, DSS filed separate motions seeking to have respondent-mother's parental rights in all three children terminated based upon neglect,

N.C.G.S. § 7B-1111(a)(1), and willful failure to make reasonable progress toward correcting the conditions that had led to the children's placement in DSS custody, N.C.G.S. § 7B-1111(a)(2). In addition, DSS alleged that respondent-mother's parental rights in Natasha were subject to termination based upon abandonment, N.C.G.S. § 7B-1111(a)(7). Similarly, DSS filed a motion seeking to have respondent-father's parental rights in Natasha terminated on the basis of neglect, N.C.G.S. § 7B-1111(a)(1); willful failure to make reasonable progress toward correcting the conditions that had led to Natasha's placement in DSS custody, N.C.G.S. § 7B-1111(a)(2); and dependency. N.C.G.S. § 7B-1111(a)(6).

On 28 November 2018, after a hearing held on 1 November 2018, Judge Beverly Scarlett entered a permanency planning order in which she found that DSS continued to have difficulty in communicating with respondent-mother, that respondent-mother had sent clothing to the children on three occasions, and that respondent-father continued to be incarcerated. In addition, Judge Scarlett reiterated the trial court's earlier conclusion that neither parent was making adequate progress toward reunification with the children. As a result, Judge Scarlett retained the existing primary permanent plan of adoption and secondary permanent plan of reunification.

After a hearing held on 6 February 2020, the trial court entered orders on 9 March 2020 in which it determined that respondent-mother's parental rights in all

three children and respondent-father's parental rights in Natasha were subject to termination based upon neglect, N.C.G.S. § 7B-1111(a)(1), and willful failure to make reasonable progress toward correcting the conditions that had led to the children's placement in DSS custody, N.C.G.S. § 7B-1111(a)(2); that respondent-mother's parental rights in Natasha were subject to termination based upon abandonment, N.C.G.S. § 7B-1111(a)(7); and that respondent-father's parental rights in Natasha were subject to termination for dependency, N.C.G.S. § 7B-1111(a)(6). In addition, the trial court concluded that the children's bests interests would be served by the termination of respondent-mother's parental rights in all three children and that Natasha's best interests would be served by the termination of respondent-father's parental rights.[2] Respondent-mother and respondent-father noted appeals to this Court from the trial court's termination orders.

## II. Substantive Legal Analysis

### A. Respondent-Mother's Appeal

In seeking relief from the trial court's termination orders before this Court, respondent-mother contends that the trial court erred by concluding that her parental rights in the children were subject to termination. A termination of parental

---

[2] At the time of the termination hearing, paternity for Nylah had not been established. As a result, a proceeding to terminate the unknown father's parental rights in Nylah had been initiated and service of the unknown father by publication was in process. Although paternity for Merise had not yet been established either, a putative father had been identified and DSS was making efforts to determine whether that individual was actually Merise's father.

rights proceeding consists of an adjudicatory stage and a dispositional stage. N.C.G.S. §§ 7B-1109, -1110 (2019); *In re Montgomery*, 311 N.C. 101, 110 (1984). At the adjudicatory stage, the petitioner bears the burden of proving by "clear, cogent, and convincing evidence" the existence of one or more of the grounds for termination delineated in N.C.G.S. § 7B-1111(a). N.C.G.S. § 7B-1109(f) (2019). This Court reviews a trial court's adjudicatory decision "to determine whether the findings are supported by clear, cogent and convincing evidence and the findings support the conclusions of law." *In re Montgomery*, 311 N.C. at 111, 316 S.E.2d at 253 (citing *In re Moore*, 306 N.C. 394, 404 (1982)). In the event that the petitioner was able to prove the existence of one or more grounds for termination, "the court proceeds to the dispositional stage, at which the court must consider whether it is in the best interests of the juvenile to terminate parental rights." *In re D.L.W.*, 368 N.C. 835, 842 (2016) (citing *In re Young*, 346 N.C. 244, 247 (1997); N.C.G.S. § 7B-1110). "[A]n adjudication of any single ground in N.C.G.S. § 7B-1111(a) is sufficient to support a termination of parental rights." *In re E.H.P.*, 372 N.C. 388, 395 (2019).

¶ 12    A trial court may terminate parental rights for neglect pursuant to N.C.G.S. § 7B-1111(a)(1) in the event that it concludes that the parent has neglected the juvenile as that term is defined in N.C.G.S. § 7B-101. N.C.G.S. § 7B-1111(a)(1) (2019). A neglected juvenile is defined, in pertinent part, as a juvenile "whose parent, guardian, custodian, or caretaker does not provide proper care, supervision, or

discipline; . . . or who lives in an environment injurious to the juvenile's welfare . . . ." N.C.G.S. § 7B-101(15) (2019). Although the trial court is authorized to terminate a parent's parental rights in a juvenile based upon neglect that is occurring at the time of the termination hearing, *see, e.g.*, *In re K.C.T.*, 375 N.C. 592, 599–600 (2020) (stating that "this Court has recognized that the neglect ground can support termination . . . if a parent is presently neglecting their child by abandonment"), the fact that "a child has not been in the custody of the parent for a significant period of time prior to the termination hearing" would make "requiring the petitioner in such circumstances to show that the child is currently neglected by the parent . . . impossible." *In re N.D.A.*, 373 N.C. 71, 80 (2019) (cleaned up). In such a situation, "evidence of neglect by a parent prior to losing custody of a child — including an adjudication of such neglect — is admissible in subsequent proceedings to terminate parental rights[,]" but "[t]he trial court must also consider any evidence of changed conditions in light of the evidence of prior neglect and the probability of a repetition of neglect." *In re Ballard*, 311 N.C. 708, 715 (1984). As a result, the trial court is also entitled to find that the parent's parental rights are subject to termination on the basis of neglect if it concludes that the evidence demonstrates "a likelihood of future neglect by the parent." *In re R.L.D.*, 375 N.C. 838, 841 (2020). As a result, even if the record is devoid of any evidence tending to show the existence of current neglect, the trial court may find that a parent's parental rights are subject to termination

based upon a determination of past neglect and a showing that a repetition of neglect is likely if the child is returned to the parent's care, *id*., at 841, n.3, with the trial court being required to evaluate the likelihood of future neglect on the basis of an analysis of any "evidence of changed circumstances occurring between the period of past neglect and the time of the termination hearing." *In re Z.V.A.*, 373 N.C. 207, 212, 835 S.E.2d 425, 430 (2019) (citing *Ballard*, 311 N.C. at 715).

¶ 13          The record reflects that the trial court found that the children were neglected in an adjudication order that was entered on 26 March 2018. In addition, the trial court found that, prior to the children's placement in DSS custody, there was a "pattern of neglect due to housing instability; substance abuse, specifically cocaine; leaving the juvenile[s] with inappropriate caretakers . . . ; and domestic violence between Respondent parents." In addition, the trial court found that, prior to the time at which DSS obtained custody of the children and while she was pregnant with Merise, respondent-mother and the children had resided at a Salvation Army shelter; that, after respondent-mother's incarceration for drug violations, she had failed to make proper arrangements for the children's care; that Merise, when she was an infant, had been "found alone in a car outside a courthouse"; that, following respondent-mother's release from incarceration, she had failed to visit with the children or provide financial assistance for their care; that respondent-mother lived in a half-way house while on parole and had failed to establish safe, stable, and

suitable housing for the juveniles; that a child medical examination had resulted in a determination that Natasha and Nylah had been physically and sexually abused and that they had suffered trauma because of respondent-mother's failure to protect them; and that respondent-mother had exposed Natasha and Nylah to "multiple unsafe situations involving but not limited to inappropriate discipline, inappropriate supervision resulting in abuse, and inadequate food." Based upon these findings of fact, the trial court determined in all three termination orders that:

> Much of the neglect experienced by the juvenile[s] is directly related to Respondent mother's instability, drug use, incarcerations, and placement with multiple caretakers to whom Respondent mother entrusted that subjected the juvenile[s] to physical and sexual abuse as well as neglect.

¶ 14    According to respondent-mother, the quoted finding demonstrates that the trial court relied upon a showing of past neglect rather than upon an analysis of the circumstances that existed at the time of the termination hearing in determining that her parental rights in the children were subject to termination on the basis of neglect. Instead of evidencing a determination that respondent-mother's parental rights in the children should be terminated based solely upon evidence of past neglect, however, we interpret the quoted language as nothing more than a summary of the prior neglect to which the children had been subjected. In reaching this conclusion, we particularly note the trial court's findings that, after DSS obtained custody of the children, respondent-mother had failed to maintain consistent contact with them and

did not understand or acknowledge the negative impact that the manner in which she had chosen to live and the identity of the caretakers with whom she had placed the children had had upon them.

The trial court's findings also reflect that respondent-mother did not enter into a case plan with DSS until 1 November 2018, which was more than a year after they had been placed in DSS custody. The trial court found that the terms and conditions set out in respondent-mother's court-ordered case plan required her to comply with a visitation agreement; resolve all of her pending legal matters; obtain and maintain housing that was sufficient for herself and the juveniles; provide verification of the stability of her housing arrangements through the provision of a lease agreement; obtain and maintain lawful employment that produced sufficient income to meet her own needs and those of the children; verify the nature and amount of her income by providing copies of pay stubs; refrain from the use of illegal or impairing substances and submit to random drug screens; comply with the requirements of her parole; obtain comprehensive mental health and substance abuse assessments and comply with any resulting recommendations; complete parenting education and demonstrate the ability to use the skills that she had learned as the result of that process; maintain consistent contact with DSS; sign releases authorizing the provision of information allowing DSS to verify her compliance with the components of her case plan; and provide certificates showing that she had satisfied the conditions of her release on

parole and her compliance with the other provisions of her case plans. In addressing the extent of respondent-mother's compliance with the provisions of her case plan, the trial court made the following unchallenged findings of fact:[3]

54. [DSS] has had ongoing difficulty in Respondent mother signing releases for service[] providers or obtaining documentation about completed services.

. . . .

59. A letter from Alternative Drug and Alcohol Counseling, LLC was admitted and received by the Court to Respondent mother's parole officer indicating successful completion of treatment. She did not previously provide this documentation. Documentation of completed drug screens was never received.

60. While on probation, Respondent mother was engaged in Potomoc Case Management Services. She did not provide documentation to or sign releases for [DSS] to obtain information about engagement in services or services offered by the agency.

. . . .

62. Due to lack of releases or documentation, it cannot be determined whether Respondent mother completed a comprehensive mental health

---

[3] There are minor variations in the numbering of the findings of fact contained in the separate different orders that the trial court entered with respect to each of the juveniles. In the interests of brevity and for ease of reference, we will quote the trial court's findings as set out in the order terminating respondent-mother's parental rights in Natasha in the text of this opinion. As a result of the fact that respondent-mother has failed to challenge any of these findings as lacking in sufficient evidentiary support, they are binding upon us for purposes of appellate review. *In re T.N.H.*, 372 N.C. 403, 407 (2019).

assessment or whether engagement in case management services adequately addressed her mental health needs.

63. After completing parole in Maryland, Respondent mother relocated to Yonkers, New York where the maternal grandmother resides.

. . . .

65. Despite the distance from the juvenile[s], Respondent mother could have consistently communicated with [DSS], executed releases for providers, provided verification of engagement in services, and appropriately participate[d] in case planning.

. . . .

67. In June 2019, Respondent mother provided a drug and alcohol counseling letter for Alssaro Counseling Services in New York; however, [DSS] was unable to confirm that Respondent mother was engaged in their services.

68. Respondent mother subsequently indicated that she did not use Alssaro Counseling Services due to insurance issues and having to find another provider.

69. Respondent mother reports being drug tested, but she has not provided any documentation of completed negative drug screens.

70. On August 1, 2019, when Respondent mother was present for a Permanency Planning Review Hearing, [DSS] referred Respondent mother for a hair follicle drug screen.

71.    Respondent mother failed to complete the requested hair follicle drug screen.

72.    Respondent mother provided the results of a blood test from Empire City Laboratories completed on January 2, 2020; however, the test appears to be related to immunizations and communicable diseases. The test did not screen for substances.

. . . .

75.    Respondent mother has not completed a parenting curriculum and applied learned knowledge of skills to address her deficits.

76.    Respondent mother continues to have housing instability. She reports renting a room or subletting an apartment; however, she has not provided an address to [DSS] or a copy of a lease or other housing agreement. Respondent mother receives her mail at the maternal grandmother's home.

Based upon these findings of evidentiary fact, the trial court determined that:

> Respondent mother's continued failure to maintain a safe and stable home, and her failure to assure that the juvenile[s] received proper supervision and necessary care subjects the juvenile[s] to the risks of physical and emotional harm and creates an environment injurious to [their] welfare.

The trial court also noted that Natasha and Nylah had "heightened trauma-related therapeutic needs due to Respondent mother's neglect" and that Nylah had required residential treatment for the purpose of addressing her mental health problems and accompanying behaviors. According to the trial court, the neglect that the juveniles had suffered in the past was likely to "repeat or continue" in the event that the

juveniles were returned to respondent-mother's care, with this determination resting upon evidence concerning the prior neglect that the juveniles had experienced coupled with respondent-mother's failure to establish a "safe, stable, substance-free home"; her lack of contact with the juveniles; and her inability to address the juveniles' trauma-related needs.

¶ 16     In response, respondent-mother asserts that the trial court's findings do little more than restate earlier findings and that certain of them lack sufficient evidentiary support.  However, the record does not support respondent-mother's contentions.  For example, respondent-mother conceded that, at the time of the termination hearing, she was subletting a single room for herself, admitted that she did not have a lease, and acknowledged having lived with a friend before beginning to rent the room that she occupied at the time of the termination hearing.  In light of this evidence, the trial court could have properly determined that respondent-mother had failed to establish stable housing that was suitable for both herself and the juveniles.  *See In re D.L.W.*, 368 N.C. at 843 (stating that it is the trial court's duty to consider all of the evidence, to pass upon the credibility of the witnesses, and to determine the inferences that should be drawn from that evidence).

¶ 17     In addition, the record reflects that respondent-mother's case plan required her to submit to random drug screens.  According to a social worker who testified at the termination hearing, respondent-mother never submitted to random drug

screens. The same social worker testified that, even though DSS had requested that respondent-mother submit to a hair follicle screen when she was in North Carolina in August 2019, she failed to do so. For that reason, the social worker testified that DSS had been unable to verify that respondent-mother had maintained sobriety. As a result, the trial court had ample justification for concluding that respondent-mother had failed to overcome her substance abuse problems.

As far as the issue of visitation is concerned, the record reflects that Natasha did not wish to have any contact with respondent-mother, whom she blamed for causing the circumstances in which the children found themselves. In addition, the record contains evidence tending to show that, for a period of time, Nylah lacked the stability to permit visitation with respondent-mother. A social worker testified that respondent-mother had a "strained relationship" with Merise in light of respondent-mother's "lack of involvement" with the child and asserted that respondent-mother had not seen Merise since her incarceration, which had occurred when Merise was four months old, and that Merise did not recognize respondent-mother. On the one occasion when she actually visited with Merise, respondent-mother only spent half of her allotted visitation time with the child. For all of these reasons, we hold that the record contains ample support for the trial court's determination that there had been little contact between respondent-mother and the children.

The record also contains sufficient evidence to support the trial court's determination that respondent-mother had failed to demonstrate the ability to deal with the juveniles' "trauma-related needs and accompanying behavior[s]." Although respondent-mother testified that she was being treated for depression, she never provided any verification that tended to show the completion of a comprehensive mental health assessment or that she had been complying with any resulting treatment recommendations. In addition, a social worker and a social work supervisor both testified that respondent-mother had a limited understanding of the mental health problems from which the children suffered. According to both the social worker and the social work supervisor, respondent-mother believed that the children "just want to come home." Moreover, the social worker testified that, in light of Natasha and Nylah's special needs, both children needed a caretaker who thoroughly understood their mental health diagnoses and related treatment needs and that respondent-mother did not appear to have these attributes. Finally, a social worker testified that she had been unable to verify that respondent-mother had completed the parenting class required by her case plan. As a result, the trial court had ample justification for concluding that respondent-mother was not prepared to address the juveniles' trauma-related needs.

Although respondent-mother contends that the trial court failed to give proper consideration to the progress that she had made and the extent to which her

circumstances had changed since her release from incarceration and that the trial court's determination that "[t]he risk [to the juveniles of] continued mental, physical, and emotion[al] impairment if [they were] in Respondent mother's custody remains" lacked sufficient record support, we are not persuaded by this argument. The trial court's orders contain numerous findings describing the components of her case plan that respondent-mother successfully completed. For example, the trial court found that respondent-mother had successfully satisfied the terms and conditions of her parole and that respondent-mother had obtained gainful employment. According to well-established North Carolina law, however, respondent-mother's compliance with a portion of her case plan "does not preclude a finding of neglect." *In re J.J.H.*, 376 N.C. 161, 184 (2020) (citing *In re D.W.P.*, 373 N.C. 327, 339–40 (2020)); *see also In re Y.Y.E.T.*, 205 N.C. App. 120, 131 (2010) (acknowledging that a "case plan is not just a check list" and that "parents must demonstrate acknowledgement and understanding of why the juvenile entered DSS custody as well as changed behaviors"). Although respondent-mother had made some progress toward satisfying the requirements of her case plan, the trial court could reasonably determine, based upon the prior neglect that the children had experienced, respondent-mother's failure to establish stable housing that was free from substance abuse, respondent-mother's lack of contact with the juveniles, and respondent-mother's inability to meet the children's trauma-related needs, that future neglect was likely in the event that they

were returned to her care, *see In re M.A.*, 374 N.C. 865, 870 (2020) (holding that, even though the respondent claimed to have made reasonable progress toward satisfying the requirements of his case plan, the trial court's findings relating to his failure to adequately address the issue of domestic violence, which had been the primary reason for the children's removal from the family home, were, "standing alone, sufficient to support a determination that there was a likelihood of future neglect"), and that respondent-mother's parental rights in the children were subject to termination on the basis of neglect. As a result, since the trial court's conclusion that a single ground for termination exists is sufficient, in and of itself, to support termination of respondent-mother's parental rights, *In re E.H.P.*, 372 N.C. at 395, and since respondent-mother has not argued that the trial court's determination that termination of her parental rights would be in the children's best interests constituted an abuse of discretion, s*ee* N.C.G.S. § 7B-1110(a) (2019), we affirm the trial court's orders terminating respondent-mother's parental rights in all three children.

## B. Respondent-Father's Appeal

Similarly, respondent-father argues that the trial court erred by concluding that his parental rights in Natasha were subject to termination. In determining that respondent-father's parental rights in Natasha were subject to termination for neglect pursuant to N.C.G.S. § 7B-1111(a)(i), the trial court made findings of fact

describing the circumstances that led to Natasha's placement in DSS custody and

noting that respondent-father had been incarcerated and had failed to take any action

to facilitate a placement for Natasha when she entered foster care. In addition, the

trial court found that:

> 41. Respondent father is incarcerated . . . [in] Huntingdon, Pennsylvania. He has a tentative release date in 2021.
>
> 42. Respondent father has not provided any tangible items for the juvenile or otherwise provided financial assistance to support the juvenile. His ability is limited by incarceration.
>
> 43. Respondent father did not remain in consistent contact with [DSS] while the juvenile has been in foster care.
>
> 44. Recently, contact with Respondent father has improved. He has acknowledged and expressed remorse for his inability to protect the juvenile from abuse and neglect due to multiple inappropriate caretakers.
>
> 45. Respondent father did not correspond or sen[d] letters to the juvenile until a recent letter in which he expressed how much he cared for the juvenile and to ask for forgiveness.

In his initial challenge to the trial court's termination order, respondent-father

argues that Finding of Fact No. 42 lacks sufficient evidentiary support. After

conceding that a social worker had testified that he had failed to provide any financial

assistance to Natasha's caretaker, respondent-father directs our attention to the

report relating to Natasha's child medical examination, in which Natasha's caretaker

had stated that respondent-father was "help[ing] out materially and financially to provide for . . . [Natasha]." As we have previously noted, however, the trial court is responsible for resolving such contradictions in the record evidence. *See In re D.L.W.*, 368 N.C. at 843. As a result, we hold that Finding of Fact No. 42 has sufficient record support.

¶ 23      Secondly, respondent-father contends that Finding of Fact No. 43 conflicts with the record evidence. In support of this contention, respondent-father points to evidence that (1) he contacted the guardian ad litem on 9 November 2017 for the purpose of offering to assume responsibility for caring for Natasha and Nylah following his release from incarceration; (2) that DSS had noted in a February 2018 court report that respondent-father had signed and returned the information release and consent forms that DSS had sent to him; and (3) that respondent-father had informed DSS on 25 October 2018 that he might be released prior to his tentative release date, that he did not wish to relinquish his parental rights, that he hoped to reunify with Natasha, and that he wanted a social worker to tell Natasha that he loved and missed her.

¶ 24      Although the record clearly reflects that respondent-father had some contact with DSS, it also supports the trial court's finding that his contacts with DSS had been inconsistent. For example, the record evidence tends to show that respondent-father had not had any contact with DSS between late 2018 and the preparation of a

court report in February 2020, in which DSS had stated that "[c]ontact with [respondent-father] has been inconsistent until recently when he reached out wanting to discuss his case[.]" The court report further indicated that DSS had been able to maintain contact with respondent-father in recent months and that he had expressed remorse about his inability to care for and protect Natasha when she needed his help. Although respondent-father did send Natasha a letter in which he asked for her forgiveness and made clear how much he cared for her, the letter in question had been his first contact with Natasha after her entry into DSS custody. As a result, the record adequately supports the trial court's finding concerning the inconsistency of respondent-father's contacts with DSS.[4]

¶ 25      The trial court further found that the neglect that Natasha had experienced was likely to "repeat or continue" in the event that she was returned to respondent-father's care, with the trial court having based this finding upon the evidence concerning the neglect that Natasha had previously suffered, the fact that the neglect that led to Natasha's placement in DSS custody had occurred while he was incarcerated, and the fact that Natasha had been temporarily placed in foster care while in respondent-father's custody in 2007. In addition, the trial court found that, because of his lack of regular contact with Natasha and the fact of his incarceration,

---

[4] We also note that the trial court softened the import of Finding of Fact No. 43 in Finding of Fact No. 44 by noting the recent improvements in the level of contact between respondent-father and DSS.

respondent-father had failed to ensure that Natasha had received appropriate care and supervision. The trial court further found that respondent-father's "criminal activity and absence from the juvenile's life constitutes abandonment resulting in his inability to protect her from abuse and neglect [which] subject[ed] the juvenile to physical and emotional harm." Finally, the trial court found that respondent-father remained incarcerated, that it was "unclear whether reentry upon release will be successful[,]" and that respondent-father "does not have the present or near future ability to establish a safe home for the juvenile."

¶ 26          In respondent-father's view, the record did not contain sufficient evidence to support a finding that Natasha experienced neglect while in his care, with the only support for this assertion consisting of references contained in child protective services reports from 2007 to 2016. According to respondent-father, the statements in question constituted mere allegations and were, for the most part, directed toward conduct in which respondent-mother had engaged. A careful review of the record reflects, however, that a social worker had testified that, in 2007, Natasha had been placed in foster care as the result of concerns relating to domestic violence, drug distribution, and respondent-father's use of drugs. In light of this evidence, the trial

court was entitled to infer that neglect by respondent-father had resulted in Natasha's placement in foster care in 2007. *See In re D.L.W.*, 368 N.C. at 843.[5]

¶ 27 In addition, respondent-father argues that the trial court's references to his incarceration as having resulted in neglect or abandonment rested upon a misapprehension of law given that "[i]ncarceration, standing alone, is neither a sword nor a shield in a termination of parental rights decision," *In re Yocum*, 158 N.C. App. 198, 207–08, *aff'd* 357 N.C. 568 (2003), with the trial court having erroneously predicated its determination that he had neglected Natasha upon the mere fact of his incarceration. *Id.* Although the trial court did find that respondent-father had failed to send any tangible items for Natasha's benefit or to provide her caretakers with financial assistance, it acknowledged that respondent-father's incarceration limited his ability to do so. *Cf. In re A.J.P.*, 375 N.C. 516, 530 (2020) (stating that "[a] parent's incarceration is a circumstance that the trial court must consider in determining whether the parent has made reasonable progress toward correcting those conditions which led to the removal of the juvenile" (cleaned up)). The trial court also found that, during his period of incarceration, respondent-father made no attempt to

---

[5] Even if this finding lacked sufficient evidentiary support, any such defect would not fatally undermine the trial court's order given the absence of any dispute about whether Natasha had been adjudicated to be a neglected juvenile in 2018. *See In re M.A.W.*, 370 N.C. 149, 153 (2017) (holding that a prior adjudication of neglect based on a mother's substance abuse and mental health issues was "appropriately considered" by the trial court as "relevant evidence" in proceedings to terminate the parental rights of a father who was incarcerated at the time of the prior adjudication).

contact Natasha, with the exception of sending a single letter, and that he had had limited contact with DSS. *See In re S.D.*, 374 N.C. 67, 75–76 (2020) (stating that "incarceration does not negate a father's neglect of his child because the sacrifices which parenthood often requires are not forfeited when the parent is in custody," so that, "while incarceration may limit a parent's ability to show affection, it is not an excuse for a parent's failure to show interest in a child's welfare by whatever means available" (cleaned up)). Finally, the trial court made the unchallenged finding that, when respondent-father was not incarcerated, "he was only involved in the juvenile's life in a limited way[.]" As a result, while the trial court did refer to respondent-father's incarceration in its findings of fact, it did so only in the context of acknowledging the limitations upon his ability to take certain steps that would have helped him develop and maintain a relationship with Natasha that resulted from his incarceration rather than basing its finding of neglect solely upon the fact that he was incarcerated. As a result, after a careful examination of the record, we hold that the trial court did not err by concluding that a repetition of neglect was likely, s*ee In re O.W.D.A.*, 375 N.C. 645, 653–54 (2020) (stating that "evidence of changed conditions must be considered in light of the history of neglect by the parents and the probability of a repetition of neglect" and that, although respondent-father had made some recent, minimal progress in attempting to reunify with Natasha, "the trial court was within its authority to weigh the evidence and determine that these eleventh-

hour efforts did not outweigh the evidence of his persistent failures to make improvements . . . and to conclude that there was a probability of repetition of neglect" (citation omitted)), and that respondent-father's parental rights in Natasha were subject to termination for neglect pursuant to N.C.G.S. § 7B-1111(a)(1).

¶ 28      Secondly, respondent-father contends that he received ineffective assistance of counsel at the termination hearing.  In respondent-father's view, the failure of his trial counsel to ensure that he was able to attend the termination hearing on a remote basis and the fact that his trial counsel failed to present evidence, cross-examine witnesses, lodge any objections, or advance any arguments on respondent-father's behalf constituted deficient performance that prejudiced his chances for a more favorable outcome at the termination hearing.  We do not find respondent-father's argument persuasive.

¶ 29      A "parent has the right to counsel, and to appointed counsel in cases of indigency, unless the parent waives the right," in a termination of parental rights proceeding.  N.C.G. S. § 7B-1101.1(a) (2019).  "Counsel necessarily must provide effective assistance, as the alternative would render any statutory right to counsel potentially meaningless."  *In re T.N.C.*, 375 N.C. 849, 854, 851 S.E.2d 29, 33 (2020).  "To prevail on a claim of ineffective assistance of counsel, respondent must show that counsel's performance was deficient and the deficiency was so serious as to deprive [him] of a fair hearing."  *Id*. (cleaned up).  "To make the latter showing, the respondent

must prove that 'there is a reasonable probability that, but for counsel's errors, there would have been a different result in the proceedings.'" *Id*. (quoting *State v. Braswell*, 312 N.C. 553, 563, 324 S.E.2d 241, 248 (1985)).

¶ 30        A careful examination of respondent-father's brief clearly demonstrates that he has failed to show that he suffered any prejudice as a result of the allegedly deficient performance of his trial counsel. Simply put, nothing in the record suggests that there was anything that respondent-father's trial counsel could have done to overcome the obstacles that he faced in this case arising from the undisputed evidence that respondent father had failed to make any significant effort to prevent Natasha from entering into DSS custody and had failed to take significant steps to develop and maintain a relationship with Natasha or to remain in consistent contact with DSS once Natasha had entered DSS custody. Thus, we hold that respondent-father is not entitled to relief from the trial court's termination order on the basis of ineffective assistance of counsel. As a result, given that the trial court's determination that a single ground for termination exists is sufficient, in and of itself, to support the termination of respondent-father's parental rights in Natasha, *In re E.H.P.*, 372 N.C. at 395; the fact that respondent-father has not argued that the trial court's determination that the termination of his parental rights would be in Natasha's best interests constituted an abuse of discretion; and the fact that respondent-father's challenge to the quality of the representation that he received

from his trial counsel lacks merit, we affirm the trial court's order terminating respondent-father' parental rights in Natasha as well.

AFFIRMED.